UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Knight MPIC Ventures, LLC, Knight MPIC          :
Ventures II, LLC, Knight MPIC Ventures III, LLC, :
                                                 :  Case No.
                          Plaintiffs,            :
         vs.                                     :
                                                 :
Kraig T. Higginson,                              :
                                                 :
                          Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Knight MPIC Ventures, LLC ("Knight MV"), Knight MPIC Ventures II, LLC ("Knight MV II"), Knight MPIC Ventures III, LLC ("Knight MV III")(collectively "Plaintiffs"), by their attorneys Locke Lord LLP, as and for their complaint against defendant Kraig T. Higginson ("Higginson" or "Defendant") allege as follows:

## NATURE OF THE ACTION

      1.    This is an action for breach of contract and unjust enrichment arising out of defendant Kraig T. Higginson's breach of a guaranty agreement (the "Guaranty"), in which he personally and unconditionally guaranteed the repayment of loans that Plaintiffs respectively made to TW Life I S.à.r.l. ("TW I"), TW Life II S.à.r.l. ("TW II") and Baltic Ventures S.à.r.l. ("Baltic" and together with TW I and TW II, collectively, the "Borrowers").

## PARTIES

      2.    Plaintiff Knight MV is a single-member limited liability company formed under the laws of the state of California, with its principal place of business at 4751 Wilshire Boulevard, Suite 111, Los Angeles, CA 90010.  The sole member of Knight MV is Bret Conrad Hankey, a United States citizen and resident of the state of California.

      3.    Plaintiff Knight MV II is a limited liability company formed under the laws of the state of California, with its principal place of business at 4751 Wilshire Boulevard, Suite 111,

Los Angeles, CA 90010. The sole member of Knight MV II is Don R. Hankey, a United States citizen and resident of the state of California.

4.      Plaintiff Knight MV III is a limited liability company formed under the laws of the state of California, with its principal place of business at 4751 Wilshire Boulevard, Suite 111, Los Angeles, CA 90010.  The sole member of Knight MV III is Amit Shah, a permanent resident of the state of California.

5.      Defendant Kraig T. Higginson is a United States citizen who, on information and belief, resides in Utah, with an address at 1190 Spring Creek Place, A2, Springville, Utah 84663.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  The parties' citizenship is completely diverse and the amount in controversy well exceeds the sum of $75,000.00, exclusive of interest and costs.

7.      Venue is proper because Higginson has consented to jurisdiction and venue in this district pursuant to Section 8.9 of the Guaranty.

## FACTS

**The Loan Agreements**

8.      Knight MV entered into a loan and security agreement with TW I dated October 9, 2017.

9.      Knight MV II entered into a loan and security agreement with TW II dated October 9, 2017.

10.    Knight MV III entered into a loan and security agreement with Baltic dated October 9, 2017.

11.     The three loan and security agreements (collectively, the "Loan Agreements") are identical, but for the identities of the parties.

12.     The obligations of the Borrowers under the Loan Agreements are secured by, among other things, certain life insurance policies (collectively, the "Policies") owned by wholly-owned subsidiaries of the Borrowers.

13.     Pursuant to the Loan Agreements, Plaintiffs loaned Borrowers over $100 million that Borrowers used to refinance certain indebtedness, pay insurance premiums on the Policies, and for transaction fees and other expenses of the Borrowers.  In exchange, Borrowers agreed to repay the principal balance of such loans and advances, together with accrued and unpaid interest thereon, and fees and expenses, including without limitation reasonable attorneys' fees (collectively, the "Obligations"), upon the maturities of the Loan Agreements.

14.     As set forth in Section 8.1 of the Loan Agreements, Borrowers' failure to timely pay the Obligations on demand or at maturity would constitute an Event of Default under each Loan Agreement.

15.     Upon the occurrence of such Event of Default, Plaintiffs were entitled to exercise certain contractual remedies under Section 9 of each Loan Agreement.  Under Section 9.1(b) of each Loan Agreement, Plaintiffs were entitled to accelerate all amounts due under the Loan Agreements upon the occurrence of an Event of Default.

16.     In lieu of, or simultaneously with, exercising the remedies set forth in Section 9 of each Loan Agreement, Plaintiffs were entitled, upon the occurrence of an Event of Default, to exercise their rights under the Guaranty and seek remuneration from Higginson.

**The Guaranty**

17.     To induce Plaintiffs to enter into the Loan Agreements, Higginson agreed to personally and unconditionally guarantee Borrowers' performance of the Obligations under the Loan Agreements.

18.     Thus, on or around October 9, 2017, Higginson and Plaintiffs entered into the Guaranty.  The Guaranty is attached to this complaint as Exhibit A.

19.     The Loan Agreements expressly acknowledge the Guaranty. It is defined as the "Additional Guaranty" in Section 1.1 of each Loan Agreement.

20.     As set forth in Section 1.4 of the Guaranty, Higginson entered into the Guaranty in his personal capacity and accepted personal liability for the repayment of the aggregate principal amount of the loans and other extensions of credit included in the Obligations under the Loan Agreements.

21.     Higginson's guarantee of Borrowers' performance under the Loan Agreements was absolute and unconditional, as evidenced by Section 1.1 of the Guaranty:

> The Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the punctual payment, when due, whether at stated maturity, by acceleration or otherwise, of all present and future obligations, liabilities, covenants and agreements required to be observed, performed, or paid by the Borrowers whether for principal, interest (including interest accrued after the commencement of any insolvency, bankruptcy or reorganization of any Borrower), costs, expenses and fees and agrees to pay any and all reasonable costs, fees and expenses incurred by any Lender (including any fees, charges and disbursements of any counsel for such Lender) in any way related to the enforcement or protection of such Lender's rights hereunder.

22.     Under Section 1.4 of the Guaranty, Higginson's personal liability for the aggregate principal amount of loans included in the Obligations was capped at $4,500,000.

4

23.     Further, pursuant to Section 2 of the Guaranty, including subsections 2.1 through 2.6 thereof, Higginson agreed: (i) that Plaintiffs need not attempt to collect any Obligations from any Borrower in order to enforce the Guaranty against him; and (ii) to waive certain defenses. These waived defenses include: lack of validity/enforceability of Borrowers' Obligations or any Loan Agreement; any defense based on a change in the time, manner, place of payment or any other term of any of the Obligations under the Loan Agreements; any defense based on the taking, exchange, release, subordination or non-perfection of any collateral under the Loan Agreements, including, among other things, the Policies; any defense based on alleged failure or untimeliness of notice; the right to revoke the Guaranty; and the statute of limitations, or other circumstances relating to any representations made by Plaintiffs.

24.     Under Section 8.1 of the Guaranty, Higginson agreed to pay to Plaintiffs all reasonable expenses, including attorneys' fees, legal expenses and other costs that any Plaintiff may incur as a result of having to enforce the terms of the Guaranty.

**Borrowers Default Under the Loan Agreements and Higginson Breaches the Guaranty**

25.     Under Section 8.1 of each Loan Agreement, Borrowers were required to repay the Obligations on the "Final Maturity Date" as such term is defined in each Loan Agreement.  The Final Maturity Date was initially defined as January 15, 2018 (with an option to extend such date provided that certain conditions irrelevant to this lawsuit were met).

26.     On or about December 22, 2017, Plaintiffs and Borrowers entered into a certain omnibus agreement dated December 22, 2017 that, among other things, amended the Loan Agreements to extend the Final Maturity Date to April 15, 2018.

27.     Accordingly, Borrowers' deadline to repay the Obligations under the Loan Agreements was extended to April 15, 2018.

28.     Borrowers did not repay the Obligations under the Loan Agreements on or before April 15, 2018.

29.     Borrowers' failure to repay the Obligations constituted an Event of Default and breach of contract under Section 8.1 of the Loan Agreements.

30.     Due to Borrowers' breach of their Obligations under the Loan Agreements, Plaintiffs were entitled to enforce their rights under the Guaranty and recover damages from Higginson.

31.     Accordingly, on April 19, 2018, Plaintiffs sent demand letters to Higginson declaring an Event of Default under each Loan Agreement and demanding payment from Higginson under the Guaranty.

32.     Higginson failed to pay Plaintiffs in accordance with the Guaranty.

33.     Higginson's failure to pay Plaintiffs for Borrowers' breach of the Loan Agreements is itself a breach of Section 1.1 of the Guaranty.

**Strict Foreclosure and Forbearance Agreement and Higginson's Continuing Obligation**

34.     On or around May 25, 2018, after Borrowers defaulted on the Loan Agreements and Higginson breached the Guaranty, Plaintiffs, Borrowers, Higginson and certain other affiliates of the Borrowers and Higginson entered into a Strict Foreclosure and Forbearance Agreement dated May 25, 2018 (the "SFFA").

35.     Under Section 2 of the SFFA, Higginson and Borrowers acknowledged the amount of each Borrower's indebtedness to Plaintiffs under each Loan Agreement as of the effective date of the SFFA.

36.     Specifically, Higginson and Borrowers acknowledged that: (i) TW I owed to Knight MV the amount of $34,845,703.92; (ii) TW II owed to Knight MV II the amount of

$34,845,703.92; and (iii) Baltic owed to Knight MV III the amount of $34,845,703.91. Accordingly, Borrowers acknowledged that they owed Plaintiffs a total of $104,537,111.75 under the Loan Agreements.

37.     Under the SFFA, Plaintiffs agreed to forbear, for a limited time, from exercising certain of their respective rights and remedies against Borrowers and Higginson as a result of Borrowers' defaults under the Loan Agreements, in exchange for certain consideration.

38.     Under Section 7 of the SFFA, in consideration for their forbearance, Plaintiffs accepted the Policies from the Borrowers in partial satisfaction of the Obligations.

39.     At the time of entering into the SFFA, Plaintiffs agreed to reduce the amount of Higginson's liability under the Guaranty from $4,500,000 to $3,500,000 based on Higginson's assurances to Plaintiffs that Borrowers would perform their obligations under the SFFA.  As Plaintiffs describe below, those assurances were hollow and Borrowers did not perform under the SFFA.

40.     Section 7 of the SFFA states that Plaintiffs' acceptance of the Policies satisfied all of Borrowers' Obligations except for that portion of the Obligations consisting of the unpaid principal amount of $3,500,000.

41.     The SFFA acknowledged and reaffirmed Higginson's liability under the Guaranty for Borrowers' Obligations under the Loan Agreements.  Section 8 of the SFFA states that Higginson shall be liable, pursuant to the Guaranty, for that portion of the Obligations consisting of the unpaid principal amount of $3,500,000.

42.     Under Section 9 of the SFFA, Plaintiffs granted options to the Borrowers to purchase the Policies from Plaintiffs.

43.     Under Section 9(iii) of the SFFA, as a condition precedent to exercising their option to purchase the Policies, Borrowers were required to deliver to Plaintiffs a written notice in the form provided as Exhibit A to the SFFA (the "SFFA Notice") on or before July 18, 2018.

44.     Under Section 10(ii) of the SFFA, Borrowers and Higginson acknowledged that Plaintiffs' agreement to forbear from exercising their remedies would terminate upon the earlier to occur of certain events, one of which was Borrower's failure to deliver the SFFA Notice on or before July 18, 2018.

45.     On July 18, 2018, Borrowers attempted to deliver an SFFA Notice to Plaintiffs in a substantially and materially different form than the form of SFFA Notice attached to the SFFA as Exhibit A.

46.     Borrowers' counsel acknowledged to Plaintiffs that such modified SFFA Notice did not conform to the requirements of the SFFA.

47.     On July, 18, 2018, Plaintiffs rejected Borrowers' nonconforming and materially altered SFFA Notice.

48.     Accordingly, Borrowers have not exercised their option to purchase the Policies from Plaintiffs, such options have terminated, and Borrowers still owe Plaintiffs $3,500,000 of unpaid principal under the Loan Agreements, plus accrued interest.

49.     Under the Guaranty, Higginson is a primary obligor of the amounts Borrowers owe to Plaintiffs under the Loan Agreements.

50.     Higginson's failure to pay Plaintiffs for Borrowers' breach of the Loan Agreements is a breach by Higginson of Section 1.1 of the Guaranty.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT (Guaranty)

51.     Plaintiffs restate, reallege and incorporate by reference all previous paragraphs.

8

52.     Under the Loan Agreements, Plaintiffs advanced over $100 million to Borrowers.

53.     Borrowers were obligated under the Loan Agreements to repay Plaintiffs on the Final Maturity Date.

54.     Borrowers failed to repay Plaintiffs the amount that Plaintiffs advanced to Borrowers under the Loan Agreements on the Final Maturity Date.

55.     Borrowers still have not fully repaid Plaintiffs and, accordingly, a debt is owed to Plaintiffs.

56.     Higginson personally and unconditionally guaranteed the performance of Borrowers' obligations under the Loan Agreements, including repayment to Plaintiffs of the amounts Plaintiffs advanced to Borrowers under those agreements, in an aggregate principal amount not exceeding $4,500,000, as set forth in Sections 1.1 and 1.4 of the Guaranty:

> The Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the punctual payment, when due, whether at stated maturity, by acceleration or otherwise, of all present and future obligations, liabilities, covenants and agreements required to be observed, performed, or paid by the Borrowers whether for principal, interest (including interest accrued after the commencement of any insolvency, bankruptcy or reorganization of any Borrower), costs, expenses and fees and agrees to pay any and all reasonable costs, fees and expenses incurred by any Lender (including any fees, charges and disbursements of any counsel for such Lender) in any way related to the enforcement or protection of such Lender's rights hereunder.
>
> …
>
> Notwithstanding any provision contained herein to the contrary, Guarantor's personal liability…for the aggregate principal amount of loan and other extensions of credit included in the Obligations at any time shall not exceed $4,500,000.

57.     After Borrowers defaulted on their obligations to Plaintiffs under the Loan Agreements, Plaintiffs sought payment from Higginson pursuant to the Guaranty.

9

58.     Higginson failed to remit such payment to Plaintiffs.

59.     Higginson and Borrowers entered into the SFFA with Plaintiffs whereby Higginson and Borrowers acknowledged that (i) Borrowers owed Plaintiffs $104,537,111.75 under the Loan Agreements and (ii) Higginson is liable under the Guaranty for the portion of Borrowers' Obligations consisting of the unpaid principal amount of $3,500,000.

60.     As set forth in the SFFA, Borrowers failed to deliver to Plaintiffs the SFFA Notice by July 18, 2018, and therefore still owe the $3,500,000 of unpaid principal, plus interest, under the Loan Agreements and SFFA.

61.     Higginson is the primary obligor for Borrowers' Obligations under the Loan Agreements.

62.     Higginson's failure to pay the debt owed by Borrowers that he personally and unconditionally guaranteed is a breach by Higginson of the Guaranty that has damaged Plaintiffs in an amount to be determined at trial, but no less than $3,500,000, plus interest.

## SECOND CAUSE OF ACTION:
## UNJUST ENRICHMENT

63.     Plaintiffs restate, reallege and incorporate by reference all previous paragraphs.

64.     Borrowers and Higginson negotiated for Plaintiffs to make certain loans and advances to Borrowers.

65.     Plaintiffs loaned and advanced over $100 million to Borrowers following these negotiations.

66.     Higginson requested that Plaintiffs loan Borrowers money while knowing and understanding that Plaintiffs expected to be repaid.  In fact, Higginson personally guaranteed that Borrowers would repay Plaintiffs.

67.     Plaintiffs' loans to Borrowers benefitted Higginson because Higginson is the Chairman of the Board of Directors of Sundance Strategies, Inc. ("Sundance"), a company that owns a large number of net insurance benefit contracts ("NIBs") based on the Policies that served as collateral for the Loan Agreements.  According to Sundance's own SEC filings, specifically Sundance's Form 8-K dated June 5, 2018, "[Sundance's] carrying of investment in NIBs relating to [the Policies] totaled approximately $29 million at March 31, 2017…"

68.     Higginson received this benefit at Plaintiffs' expense because Plaintiffs have not been repaid, nor did they receive any benefit in return for providing the loans.

69.     Under the circumstances, it is against equity and good conscience to permit Higginson to retain the benefits conferred on him and Borrowers by Plaintiffs without restitution.

WHEREFORE, Plaintiffs requests judgment as follows:

A.     actual damages in the amount of $3,500,000, plus pre-judgment and post-judgment interest;

B.     attorneys' fees, costs and expenses, as provided for by Sections 1.1, 7, 8.1 of the Guaranty; and

C.     awarding such other and further relief as the Court deems just and proper.

Dated: September 4, 2018          Respectfully submitted,
       New York, New York

                                  LOCKE LORD LLP

                                   *s/William D. Foley*
                                  WILLIAM D. FOLEY (WF3492)
                                  JEFFREY KRAMER (JK1019)
                                  Brookfield Place
                                  200 Vesey Street, 20th Floor
                                  New York, NY  10281
                                  212-415-8600
                                  *Attorneys for Plaintiffs*

11